Good morning. May it please the Court. Joseph Lang from Carlton Fields in Tampa with me at the Council table and on the briefs. This is Michael Yeager from Carlton Fields in New York City. We represent Appellant Sigma Corporation. I'd like to reserve three minutes for rebuttal. The 1992 anti-dumping order that is at issue in this case is not clear on its face. This is the sprinkled order? No, Your Honor. This is the 1992 China order that is the source of any obligation that exists here. It comes from that 1992 anti-dumping order, and that order is not clear on its face. The Court of International Trade has actually said that. The Court of International Trade on an appeal from an initial determination, a K-1, they call it, determination that says that it is plain. The Court of International Trade said it's not plain, and it needs to go back for a K-2 determination, which is a much more extensive evaluation and analysis of the order. And so it went back for a K-2 evaluation. I'm not sure the Court really said that. It just sort of said there was an inconsistency in Congress's explanation, right? It didn't really say that the China order wasn't clear. It said it's not plain, and that it's unreasonable. The order that they were appealing was unreasonable to explain the order, that it was not plain, and it needed to have a K-2 evaluation. But is it only because Congress had said something about it not being plain? I mean, there was an inconsistency in Congress's ruling, right? I think what you're thinking of is that Commerce said that the Sprinkler ruling was nondispositive, and that did puzzle the Court of International Trade, but that was not the only reason for the reversal. It said that the authorities that were cited by Commerce in the first instance were not convincing for why this was plain on its face. It needed to have a K-2 determination, and they sent it back for a K-2 determination. And that resulted in a 104-page order to explain why these products at issue in this case should be considered butt-weld fittings within the scope of the 1992 order. Counsel, I apologize for interrupting, but I'm going to ask all counsel these two questions. Should we wait for the Federal Circuit to decide before we decide this case? I think it is an open question, the brief, the initial brief. This is out of the records, so I'll ask for permission just to tell you about the briefing in the Federal Circuit. Is that okay? Sure. Okay. The initial brief was filed yesterday in the Federal Circuit, and I think that we have very good grounds for seeking reversal of the Court of International Trade. And, you know, I have not formally moved for a stay, but I think it would be informative to wait for the Federal Circuit to rule. And my second question is I saw on the Web yesterday that the Supreme Court continued the distribution for conference of the super-value case until the 13th. If the Supreme Court grants cert in that case, should we wait? I think that would be a very informative case. I did see that it had been relisted, and that is a case that we put very strong reliance on here, and I think it would be informative on the SAFCO issue. Now, that SAFCO issue, which is our second point on appeal, does not inform the primary issue on appeal here, and we think this can be reversed without any regard to SAFCO. Right. Let me ask you about that, whether there was an obligation. And I guess, to me, that issue turned on what the effect of the final scope ruling. Is that what it's called, the scope ruling? Yes. What the effect of that ruling is, what the government and your opponents say is that, and they quote the language from the 2021 version of the reg, that the effect of that ruling is to say that the product was always covered by the original anti-dumping duty order, right? And if that were true, then it seems to me your obligation argument falls apart, even if we take into account the regulatory regime that says, you know, we're not going to come after folks after we do the K2 analysis. So, to me, let me just pause it a little bit. This is the way I was thinking about it. You can tell me if I'm thinking about it wrong. It's no different from if I loan you money and you have to pay me back, but then I wait too long and a statute of limitations intervenes, and I'm not able to collect it from you anymore. That does not mean that you didn't have an obligation to pay me back originally, right? It seems to me that's kind of the same thing here. If we treat the effect of the final scope ruling as saying the product was always covered under the order. So, that's kind of how I'm thinking about it. There's a lot to unpack there. Let me start with the fact that the regulation that governs this case is the 2018 regulation, and that assumption is exactly the opposite in that regulation. Let's just tease these apart. I understand all of that, and we'll come back to that. Okay. Let's assume that the language that's in the 2021 version of the reg was in the 2018 version, or the version that would govern. Just am I thinking of things in the wrong way? Well, I would say that that turns the 2018 reg upside down, but if you do think of it that way, I believe it still has all kinds of due process problems. Because what happens here with the 104-page discussion is that it clarifies the order. And to say that we're going to write 104 pages of clarification long after the fact, and then we're going to say, and your actions eight years earlier are going to be governed by not knowing about those clarifications is not going to be, I don't want you to push back if you disagree, in the false claims act context. There's not going to be a due process issue, because you'll have to have been shown to have acted knowingly and whatnot, right? So we don't have to worry that an innocent client, I don't know that your client is innocent here, but assuming it was, we don't have to worry that you're going to be forced to pay trouble damages and civil penalties. There's no way I could have known, and you come along ten years later and tell me that this product was covered, this is just totally out of the blue. We're not going to have that issue in the false claims act context, it seems to me. So I'm just trying to understand why, as a conceptual matter, why is my statute of limitations or analogy incorrect from the standpoint of whether an obligation was initially owed? Because I think that commerce has determined under the L3 that we are not going to retroactively seek any sort of duties when we've had to have this K2. And I hear what you're saying about an element of the false claims act is being knowingly, but I think that if you are going to apply that in a case like this, you have to understand that the entire regime of the 1992 order, meaning how it was clarified, has to be properly presented. And that wasn't what happened here. And commerce has made the determination that there will be no retroactive application of duties under L3. But that could be just like a decision about a statute of limitations. We want there to be finality. That doesn't imply necessarily a substantive view that there never was the obligation. It's just we're not going to collect it anymore. So I don't know how you can use the idea that they're not making a retroactive to say the obligation didn't exist. There wouldn't always be a statute of limitations at issue. Sometimes there's not this much time that has passed. It's not a statute of limitations determination in L3. Commerce made the determination in L3 based on lack of notice. And, you know, the cases we cite such as DIO and United Steel, these are all cases about lack of notice as to what the regulation means in the first place. And so as to innocent importers, we're not going to proceed to try to collect that. And that's fine. Nothing wrong with that. But the False Claims Act, it seems to me, isn't just then thrown out the window, which is your argument, that there never was this obligation to begin with. That's right. Our position on the first issue is that commerce is the master of the antidote to the laws. False Claims Act applies to the statutes across the board. Here within the regime of commerce, I think it's also important to note that there's not a big gaping hole here like the government would have you believe. 1592, which the government doesn't even mention in its amicus brief, is a remedy for the government to reach back and restore duties. And so there is a remedy here. There is no gaping hole. As well, if the regulation is clear on its face, you can't escape duties that are owed by seeking a scope ruling. I hear all that. I'm not worried about a gaping hole. I'm just trying to get, as a conceptual matter, I'm trying to get this straight. Let me just go back to what I asked you originally. So I'm just going to read the language from the 2021 version. I'm going to ask you if this were in the 2018 version, how you would come out. So it says a scope ruling, that a product is covered by the scope of an order, is a determination that the product has always been covered by the scope of that order. Okay? So if that is the governing legal principle here, even after a K2 analysis, it seems to me the legal effect of that is to say, oh, no, you really did owe that money way back in 2010. Okay? It may be that because of this regulatory regime we set up, we're going to cut you some slack. We're not going to chase you down to try to collect all that. But you did owe it. That's the effect of that language, right? I think there's a much better argument under that language than under our regulation. But that is untested language, by the way, of a new regulation. And it doesn't apply here. But I hear what you're saying as to that language. It's of the government and it's brief.  They say that, well, that principle has always been in play. And they try to cite some cases that maybe aren't exactly on point for that proposition. But is your main argument simply that, well, this is not the governing legal principle given the time? That is not the governing legal principle for this case. And I think the cases that are cited by Highland and the government do not establish that that has been the legal principle. And it's exactly the opposite of the legal principle under the governing regulation under L-3. You get that from the regulatory history of the prior version of the rule. Right. And the way L-3 reads on its face. See, I don't know if I agree with you on that. I understand the language you point us to is, and I only have this, you know, the U.S. Steel and Fasteners case. But it's quoting from the regulatory history that I think you rely upon. And the way the court put it is that the public argued that, quote, the department must view any merchandise that it determines to be within the scope of an order as always having been within the scope, blah, blah, blah. And then the court says, well, Congress rejected that in the earlier version. That's correct. And so you're saying that, I guess, we should assume that now the new reg is a 180-degree flip from what the governing legal principle says. I believe that's true. I don't think I asked my question articulately before, but I'm looking now. I actually have it in front of me, the decision from the Court of International Trade. And I do think that it is struggling with what it thought was like an inconsistency in Congress's order. It says, as for the K-1 sources, Congress long ago included steel branch outlets virtually identical to Vandewaters within the scope of a companion anti-dumping duty order. It seems like they're trying to say, we think this actually was, could have been resolved under K-1. Isn't that what they're saying? I don't think that's what they're saying solely. I think they are puzzled as to the treatment of Sprinkler, which, by the way, continued even in the remand results. Congress didn't say it was this positive order. Well, I just feel like there was like this communication breakdown between the courts or something. Because it's like, I feel like Congress, they got it back and said, okay, we're supposed to do K-2. Okay, we'll do it. But I'm not sure. It's like the court thought Congress was saying it couldn't figure this out, but they don't understand why Congress couldn't figure this out. And so then they send it back, and then Congress is like, okay, well, now we've been instructed. And I think there's language in that opinion that goes beyond just talking about Sprinkler, talking about how the other sources cited by Commerce do not plainly reveal the result. I mean, it goes well beyond just the Sprinkler ruling. And I'm running out of time, and I'm not sure we have enough time. I'm just trying to, I mean, it seems like in the federal circuit now you're contesting whether the China order really covered your product. But you haven't really done that with us, right? No, I don't think we've raised that challenge directly here. As you know, the district court judge said that that's the realm of the CIT, and I'm not going to touch it. And it was not a major issue below, and we haven't raised that on appeal. But that is on appeal in the federal circuit right now. I don't think that affects the arguments we're making here, though. Well, it might because of this, like, is it really covered and has it always been? I mean, there's this time travel issue of this, that if your product is covered, maybe it always was covered, and we think that the duty was owed always, and then it could be collected under the False Claims Act. And then the federal circuit says otherwise. Well, that might be a reason we need to hold. Right, that would millitate towards waiting to see what the federal circuit says. Let's say the federal circuit says, no, it is covered. If you lose, then we can go ahead and say you always owed the money under the False Claims Act. No, no, because that's where my argument comes in is there's no obligation. So I think the federal circuit, if they reverse the very reading of the 1992 order, that would be an additional reason to reverse, but my arguments don't turn on that. My argument, and speaking of arguments, plural, I do have at least one more I'd like. Yes, I want to ask you about the safe code. Okay. So assume that you got the benefit of that rule in this case. Your opponents argue that you could possibly satisfy it anyway. So that's why I don't know, I mean, I sort of need to wait to see if the Supreme Court grants. Sir, is that what you wanted to address that on? Because that's what I would be most interested in. I'm happy to talk. I mean, everybody knows the safe code rule, so I'd be happy to talk about why it applies to us. Let's just assume it applies, though. How do you win under it? Yeah, exactly. Okay, well, I think the first prong of it is pretty easy because the Court of International Trade actually thought the order was ambiguous and required a K-2. So the face of the order has more than one objectively reasonable view of it. And so I think we get past that prong very easily. And I don't even think the district court disagreed with that, if you read his order, because the district court kind of leapfrogs that. It turns on the existence of a sprinkler. Right. It goes then to the warning away. And sprinkler couldn't possibly be authoritative guidance here. I have a vision of that, too. I mean, it's Taiwan, I guess, right? We're sure the language is the same. Right. It's ten years before the star pipe ruling. So there are numerous reasons. First of all, commerce did not think it was determinative. Commerce said it was not buying down by that to make this determination. I mean, I don't think that that is determinative, but it's certainly informative that commerce doesn't even think it's positive. I don't think they're wrong, if that's what they think. But you, what's the reason? Okay. But what I would also say is that it's not authoritative. And, indeed, it wasn't even publicly available. Their own witness had to call the department to get a copy of it. It's not available online. We have five other, there are five total companies, four other companies were sued here. Apparently nobody else found this order, from what we can tell. It came ten years before the star pipe ruling. And the star pipe ruling, because the star pipe ruling told companies to classify these products. And I would really urge everybody to look at the image, not just our descriptions and text. The image of the harmonized tariff schedule that was used to fill out the form 7501. And that image is, I just want to make sure I give you the right page, 1058, I believe, in 5ER. But can I tell you why that's important? Because star pipe told us to use the particular code that we did use. And we used the exact code that Commerce wanted us to use for this exact product. If you look at the top of that form, you'll see where the idea of steel couplings came from. Because it came right out of the headings at the top. There is no welded outlet listed at the top under the description of what this is. It has the word steel, it has the word couplings, the words came from there. If you look directly under the headings, you'll see butt weld fittings as an alternative code. That's not the right code for this product, and Commerce said that in star pipe. And so, star pipe comes well after sprinkler. And we used the right code. Okay, let me ask this. Okay, say that to take advantage of this defense, you would at the very least have had to contemporaneously do some investigation to inform yourselves as to what possible anti-dumping duty orders might be out there. You did none. You had no contemporaneous. There wasn't like you looked at this, you looked at the sprinkler rule, you looked at this other thing and said, oh, boy, there's some ambiguity. We're going to make a reasonable judgment call that our product isn't covered. You did none of that. Instead, I guess, you just sort of recklessly checked, oh, no anti-dumping duties are owed. You had no basis whatsoever for reaching that legal conclusion. And so then, if it comes along and it turns out, oh, you're wrong, do you see that's exactly the scenario in which you don't get the advantage of the safe code? So why is that incorrect? No, see, just as you can be held liable under the law that you haven't read if the law is clear, doctrines such as the rule of lenity make clear that if the law is unclear, even if you hadn't read it, you can't be held liable for it. And that is exactly what Schutt says. Schutt has a long discussion on even if you might have believed subjectively that you were violating an unclear law, the safe code standard is such that if your actions are consistent with an objectively reasonable view of the law, even if you didn't hold that at the time, you still get the benefit of safe code. All of that discussion is in super value, Schutt, and it's correct, in my opinion, and I think it's exactly what applies here. It is true as they embrace repeatedly that the testimony is that we didn't learn of the ADD order or the Sprinkler ruling until 2018. That doesn't affect the, it's an objective test, it's not a subjective test, but it does underscore, by the way, that this is not a case about lies. They have the word lies in the brief. You know, at best this is, you know, deliberate ignorance or recklessness, but. Yeah, you lose the defense in that scenario. We didn't. Well, no, I think that super value says that it's an objective standard. It's not a subjective standard, and you get the benefit even if you had not read the order. Unless you were warned off. That's the separate analysis. It's been authoritative guidance, but the only two things that have been mentioned in the order below for authoritative guidance are the actual any dumping order, which doesn't make any sense, because that's the order that had to be analyzed, and originally the district court judge referenced the Sprinkler ruling, did not reference it in denying Rule 50B, and for all the reasons I've said, the Sprinkler ruling is not authoritative. Commerce doesn't think it's authoritative. It came like a decade before the Starpipe ruling. Let me have to cut you off, because you're way over. I'm sure you have some time for rebuttal. Let's hear from the other side. Thank you. You're welcome. Good morning. My name is Nicole Summers, and I represent Island Industries. A jury heard all of the evidence here, and it determined that SGMA knowingly made false statements when it imported its welded outlets into the United States. It called them something other than welded outlets. It called them steel couplings in order to evade the anti-dumping duties. That deprived the government of millions of dollars, and it's a classic violation under the FCA. SGMA tries to escape liability here on two bases. The first about whether there was an obligation, and the second is related to Sanitor. On the obligation argument, it says it didn't have to pay because Commerce wasn't going to collect through administrative processes, but there's still an obligation to pay if you owe someone money, even if they don't collect it, there's still an obligation to pay. Can I answer my question, please? I don't know if you relied on this language from the 2021 rig, but certainly the government did. I assume you're taking the same view that even as of 2018, the background legal principle that governed here was that once a scope ruling is issued and it says that a product was covered by the original order, that that means it was basically covered for a long time, you know, going all the way back. Your opponent says no, actually the background legal principle was exactly the opposite. What is your response to that? I think the way that you articulated it is exactly right. It's true that that language only appeared in the 2021 regulation, but it wasn't the opposite before that. The law actually was well settled that when you have a scope ruling, that that is what the order always meant. We cited, for example, in our brief, a case called Shenyang Yorndo, which came out of the court. Quote me the language from that opinion that stands for the proposition that's now reflected in this 2021 regulation. Okay, I don't have the exact language in front of me. I don't know, because I looked at that case, and I don't think it says what you're claiming it says. I don't think so. I'd point the court to that citation, which is 961 F sub 2D at 1304. There are other cases that are cited in the government's brief, and then there was also a discussion of this on the part of the district court in the summary judgment opinion, and I think also in the JNOV opinion where additional cases are cited. That's the case that stands for the proposition that is now in the 2021 regulation, back in 2015. I mean, I would point you to the Shenyang Yorndo case that's in our brief, but I think there are other cases, and I'd suggest an analogy for the court, which is it's like interpreting a statute. There are key court decisions in case law that interprets, you know, the reach of a statute, and when the court does that, it is what the statute always meant. The court doesn't have the authority to expand or contract the scope of the statute, but just to say what it means. So when you ask the regulatory history, that's your opponent quotes, which suggests that the public actually made the very argument that you're now suggesting, and that Commerce rejected that, at least under the earlier version of the regulation. What's your response to that? I think it's confusing two things. One, about whether there's an obligation to pay, and two, about what the administrative processes for liquidation will be. I think as some of the earlier questions suggested, there's a certain concept of finality with respect to collecting through liquidation, that even if the money is still owed, there are circumstances in which the government doesn't collect. Now, I don't actually think that SGMA can rely much on those liquidation, the regulation here, because there's an exception to the regulation, which is in the statute that's 19 U.S.C. 1592, that says that those liquidation finality rules don't apply when someone has committed fraud against the government in bringing those materials into the United States. So even on SGMA's argument on its own terms, where they say, we're out of the woods because we don't have to pay through liquidation or through an administrative process, that's just incorrect because of the presence of Section 1592. But the 1592 is really the icing on the cake, because we think that these are just two different questions. Whether you owe the obligation is a different question from what you collect through liquidation. And the language that I think SGMA's relying on that you mentioned with respect to that decision, where it was time for the different versions of the regulation, was just talking about the differences in collecting through liquidation. It was not saying anything about the money not being owed. It seems to me, tell me if I'm getting this wrong, but it seems to me the whole outcome on this obligation argument that they've put forward, it just depends on what the background legal principle is as to the effect of a scope ruling after a K2 inquiry or a K2 analysis, right? Because let's just say that the law was, just as a basic legal matter, if the thing is so ambiguous that you have to get to K2, that once Commerce issues those final scope rulings, and Commerce is the one that does that, yeah, I'm not an expert by any means in this regime, the effect of that, it really is prospectible. It's basically a determination that, well, the product was never covered earlier, and it's only covered once the scope ruling is issued and we go forward. If that were the background legal principle, I think they would have to be right on the obligation argument, wouldn't they? Well, if it were the background legal principle that a scope ruling means that it's only covered prospectively, i.e., the money is only owed prospectively and it was not owed at the time of entry, then yes, this would be a very different case, but that's not prime. A little bit different. Okay. The effect of it is to say that your product was not covered under the order back in 2010, let's say, because it was just too ambiguous, nobody knew. So it has only been decreed as of today, going forward, that this particular product is covered under that 1992 order. Do you see what I'm saying? Yes. It's just. I see what you're saying. What I'm trying to say is that's just not the law. The provisions on which SGMA relies are talking about the collection of the duties through the administrative process of liquidation, and in particular, particular steps that Commerce has to take where it suspends liquidation, then it holds those and suspends and then collects. And here Commerce didn't do the suspending, and as a result of it, it wasn't able to retroactively suspend and be able to go back and get some of those duties. But that is only those regulations, that section L3 on which the other side relies, is only talking about collection through the liquidation process, the administrative process. It is not talking about whether an obligation is owed. I don't think there's any law suggesting that before the 2021 regulation or anything, that the obligation was not owed. And so SGMA's argument here is just confusing this idea about whether the amount is owed with whether the government can collect through liquidation. They're wrong to say that the government can't collect through liquidation because of Section 1592. I take your point that if the law was that the money is not owed, that this would be a different situation, but that's just not the law. That's not the longstanding understanding of the CIT or of. . . No, it is true that that case before the Federal Circuit, the review was under a highly deferential standard review. I think it's very, and of course SGMA, at least up to this point, had not suggested that the case should be held. And I think it's noteworthy that everyone who has looked at this, and I really do think this is an important data point, has thought that these products were covered by the order. So you start with SPRINC, which addresses materially indistinguishable products, and Commerce said they're covered. Then you get the 2018 scope ruling request in this case. And Commerce, it didn't want to say SPRINC was dispositive, but it said these products are covered. But do you think it made a mistake when it said SPRINC wasn't dispositive? I think it was trying to be. . . I think it was a belt and suspenders type move that they didn't want to rely solely on SPRINC because it was under the Taiwan order, as opposed to the China order, although they later said that the relevant language is the same in both of those. So I think it wanted to give the CIT a more fulsome K1 analysis, recognizing that the issue might be appealed. It's been a lot of time saying it was the same, if that's what you're saying. It's been a lot of pages on that. Well, I mean, a lot of the pages actually, they go through a very long comment process where they recite every argument of the parties and then say why they're right or wrong. So if you look at the 104 pages, a lot of them are just reciting the comments of the parties. But, like, yes, I take your point. Commerce wanted to do a more fulsome analysis so it didn't just rely on SPRINC. Obviously, we think that when CIT looked at this and said, why didn't you just rely on SPRINC, it seemed to be dispositive. That seemed right. I think Commerce then addressed this and said, you know, this is clear under SPRINC. And CIT went back to Commerce and said, you know, again, in the remand results, SPRINC is informative. They said it has a longstanding interpretation, nearly identical products, exact same terms between the China and the Taiwan order. And then this went back to the CIT, which we mentioned, I think, in the 28-J letter, and the CIT again affirmed. So it's hard to imagine the Court of Appeals for the Federal Circuit coming out an alternative way. I think it's also. But if it did, we couldn't just affirm this judgment and then have it stand, right? Correct, because of the principle that is well settled, that if they determined that this was not within the scope, it would mean it was never within the scope, and that is the settled law. But we think the chance of that happening is incredibly low. And I just give the Court one more data point because I feel like the argument so far hasn't talked much at all about the evidence that was a trial that the jury heard. But one pretty interesting piece of evidence from SGMA's own representatives was that once they looked at the SPRINC ruling, once they took their head out of the sand, they realized it was dispositive. They were like, we need to stop importing the SPRINC ruling covers this, unless we can get this overturned in some way, like this is covered under the SPRINC ruling. So I understand why you think you're going to win in the Federal Circuit. But even if there's a tiny possibility, it seems like, is there any harm of us waiting for them? Because it seems like we'd have a big problem if they do something surprising. It's certainly in the Court's discretion to hold this case in abeyance, if you think that that makes sense. It's just up to this point, SGMA hasn't asked for that. And, in fact, there's been no reason to hold this case any of the time, I think, that SGMA has asked. So we would ask the Court to decide it. But, you know, it's, of course, up to the Court's judgment about what to do there. But I'm just saying, if we affirmed, let's just say tomorrow we affirmed the judgment, and then I don't know how long it takes the Federal Circuit to rule and stuff, but in a year and a half the Federal Circuit were to say, oh, actually, this was never covered. I mean, the judgment couldn't stand, but we would have already affirmed that everyone would have done it. That's why, even if there's a small chance that that would happen, why would we do that? That doesn't make sense. You know, it's up to the Court to decide what's most appropriate on that issue. I think kind of the relevant point that, before I, if I can move on, because I interpreted it that we'd like to leave the Court with on the question of whether there's an obligation here, is that, you know, that argument recognizes the longstanding principle that a scope ruling tells you what was always within the scope, in the same way that, you know, this Court, when it interprets a statute, tells you what the statute always meant. It doesn't have the ability to expand or contract the reach of the statute. But if I could move on to the objective reasonableness argument. So that argument only goes to one of Sigma's, or one of the two false statements. In this case, throughout the trial, there were two different types of false statements. There was the misdescription of the products, and then there was the false statement that there were no anti-dumping duties due. And so this claim of objective reasonableness, if it were successful, would only go to the theory with respect to there being the statement about there being no anti-dumping duties due. And that was a separate theory throughout the trial. There was a general verdict. Sigma didn't object, you know, under those circumstances. So your view is there's no reason to wait even if the Supreme Court grants cert, because if we agreed with you, we would affirm because of the general verdict. Yes, actually two reasons. One would be that there would be this alternative factual, this alternative theory. And then the second would be that even on its own terms, Sigma cannot take advantage of the defense in Safeco. And Safeco itself made clear that when it was talking about there being an objectively reasonable belief then, this was about the Fair Credit Reporting Act and whether a notice was required, that the insurance company had looked at the law and made a determination that it wasn't clear about whether the notice requirement was required. And under those circumstances, it wouldn't make sense to say that the scienter requirement of that act had been met. So it has to be a belief at the time. And then actually the Supreme Court talked about it again and made it even more clear in the HALO decision. That's where the Supreme Court was asking whether a Safeco defense made sense in the different context of the patent act. And the court actually did not use an objective reasonableness defense in that context. But what it said about Safeco is it said, Safeco focuses on, you know, what happened at the time. In fact, it said, nothing in Safeco suggests we should look at facts that the defendant neither knew nor had reason to know at the time he acted. And so this objective reasonableness defense, you know, if it's available under the False Claims Act, only is if you do something at the time. And that's really, I think, kind of the heart of the problem for Sigma here. And I think some of the court's questions have gone to this, which is the knowledge requirement under the False Claims Act. This is scienter is the element that we're talking about right here. And the scienter element can be met three ways. It can be knowingly lying, which we do think there was evidence that Sigma did. It can be deliberate ignorance, sticking your head in the sand. And it can be reckless disregard. And the best case for Sigma in terms of the trial evidence was their own admission that they didn't even look at the China order until 2018. They just didn't bother looking. So it seems like Safeco is about reasonableness, which is often objective, which does often mean it doesn't matter subjectively what anyone is thinking. Then you jump to HALO. But HALO is about the Patent Act, which has a history and case law and standard of willful bad faith that I don't think we really have here in the same way. So if we think HALO is kind of about this patent different mens rea regime, we may be left with just objectiveness under Safeco. And if that's true, do you still win under the verdict form argument? Do you need the Safeco point? So, yes, just to clarify, so regardless of any, even if you take all of Sigma's arguments about Safeco as true, we still have this alternative argument that they falsely misdescribed their products. And that was argued very clearly as an alternative throughout the trial, starting with the opening, the evidence, the closing arguments, going through each element as to how that was met. And so you can uphold the verdict just on that basis without saying a darn thing about Safeco. But if you wanted to say something or if you felt like you needed to say something about Safeco, even putting HALO to the side, if you look at Safeco itself, it was clear that that had to be a belief that was held at the time, or that there had to be an objective, reasonable belief or some actions taken at the time. It was the investigation at the time that made the Supreme Court say, okay, you can't meet the standard of the state of mind that's required under the act at issue there. And so you don't need to look at HALO. HALO just, I think, provides this additional guidance that if you're going to get the benefit of a defense, it has to be at the time. And I think that makes a lot of sense, actually. If I can just go back to kind of the context of the False Claims Act, that sticking your head in the sand and then your products being subject to invite-only duties, that is liability under the False Claims Act. I mean, it is absolutely clear that that's one of the types of knowledge that provides a basis for liability under the False Claims Act. And Sigma admitted that. We didn't look at anything until 2018. But then there actually was evidence of, you know, outright lies because there was a spreadsheet, among other things, that was introduced at trial that said that when Sigma marketed its products to others, it called them what they really were, which is welded outlets. But then it had separate columns that said, well, when we send them through customs, we're going to call them something different, steel couplings. So when it was time to make money, they said, you know, what it really was. When it was time to try to defraud the government, they didn't. And the jury had all this evidence before it. We don't know if the jury believed that it was, you know, a reckless disregard theory or a sticking-your-head-in-the-sand theory or an outright lying theory. But the best case, the best case for Sigma is that it was a sticking-your-head-in-the-sand theory, and that's still liability under the False Claims Act. I mean, I guess at the end of the day, I realize I'm over my time, and I, of course, want to answer the court's questions. But there's just not any reason to upset the jury verdict here. This is just not a case of an importer doing everything right and then somehow getting snagged in the False Claims Act. This is an importer that for years brought these items into the United States without doing any checking at all, where it's pretty well known, as our experts at a trial, that steel products from China are often subject to anti-dumping duties. And, you know, the implications, I think, of Sigma's position here would be really troubling. You know, it's the implication of its obligation argument. Its first argument is that if you can somehow kind of keep everything under wraps and fool the government for a year, and they can't collect through liquidation, then good news, you don't have an obligation anymore, and you're home free. And they can't get you under liquidation, and they can't even, you know, get the money back when you've committed fraud under the False Claims Act. And then, you know, the implication of its scienter argument, I think, is similarly troubling. It's that they can stick their head in the sand and then maybe ten or so years later try to come up with some argument about how the law was ambiguous, even if it's not something that they believed at the time. And that just seems particularly inappropriate in the context of the False Claims Act, where the knowledge requirement, you know, includes that you can't just stick your head in the sand and then fail to pay money to the government. Let me stop you there. Thank you for your argument. Two minutes on the clock for a rebuttal. Oh, no, I'm sorry. I don't have any rebuttal, but if the court has any further questions, I'm happy to have them. I forgot that you have a colleague here. So, yes, five minutes for counsel. Yes, thank you. Thank you very much. Thank you, Your Honor. Good morning. We at CISA Court, Sarah Carroll on behalf of the United States, as amicus curiae and supportive of the relator. SGMA tries to complicate aspects of this case that are quite simple when viewed correctly. As to the obligation point, it has, at all relevant periods, been the case that a product, a scope ruling clarifies that a product has always been covered under an antidumping order. And I recognize that the language of the regulations now says that more explicitly than it did, but that has always been true, or at least has been true. And the best case, what are you citing for that? Because I remember you cited the reg, which without telling us that actually it post-states the events of this year, which I found problematic. Then you had cited one case, which I looked at, and it said basically just, well, yeah, they only have the power to clarify not to expand, okay, but didn't really tell me a lot. So is there some better authority that you're going to tell us about now? I don't have other authority at my fingertips right now to present to the Court. I'd be happy to try to run it down further with Commerce and provide the Court with more information, if that would be helpful. But the Dufour-Go case from the Federal Circuit that we cite, I think, does stand for this principle. The question in Dufour-Go was whether an existing order covered a particular product. And the whole premise of the Federal Circuit's discussion was that all that Commerce does when it issues a scope ruling is clarify whether a particular product is covered. The Federal Circuit explained that anti-dumping orders, I'm sorry, have to be written by their nature in somewhat general terms. And then questions can arise about whether a particular thing is within those general terms. And so when Commerce conducts a scope proceeding and when the Federal Circuit evaluates a scope order, the question is whether the existing underlying anti-dumping order should be interpreted as including that product or not. And I think that my colleague, Ms. Fahersky's, analogy to a statute and a court interpreting a statute to decide whether a particular conduct is covered is a good one. Okay. Yeah, that would have been my assumption, that that's the same background principle we cover here. But then we have this regulatory history that your opponent relies upon. What about that? So on the regulations governing Commerce's ability to collect duties sort of through its ordinary administrative mechanism, I think that you, Your Honor, and Judge Friedland both got it just right when you were questioning my friend about the fact that, you know, people owe obligations to the government all the time. And sometimes the government, for various reasons, will not collect those debts. You know, maybe the statute of limitations has run. Maybe it's due to resource constraints. Maybe the government makes policy judgments about finality or other principles. But that doesn't absolve the public of their obligation to the government for that money. That doesn't mean that the government is somehow relinquishing any interest in the debt. And we cite cases in our brief where courts have recognized that even if there are limits on the government's ability or willingness to collect a debt through ordinary, you know, for example, Medicare recoupment means, that does not mean that a defendant can escape false claims liability. I need to ask a question that I think is, like, maybe going to seem like it's coming out of left field because no one has argued about jurisdiction here. But I am a little confused because we have a case, United Fruits and Vegetables, that says that the government couldn't bring a suit to get duties in our court. It would have to be in the Federal Circuit in the Court of International Trade. And I think part of why we have confusion here about whether we need to wait for the Federal Circuit is because we have two courts looking at this question. And I just don't quite understand why a relator can step into the shoes of the United States and be in our court for a False Claims Act case if the government itself couldn't bring a case like this here and would have to be in a different circuit. Your Honor, I have not read that case. And to be honest, I haven't thought about this question. I mean, I don't know what that case said. And I would be surprised if it said that the government's ordinary mechanisms for combating fraud under the False Claims Act are precluded by the existence of an alternate administrative scheme by which It just said that in a False Claims Act case, if the government is actually using the False Claims Act, it needs to bring it in the other circuit because that's the circuit that has jurisdiction over tariffs. I don't know the question to that, Your Honor. And we'd be happy to look into it and have something with the court addressing the point. But I don't want to try to guess about the right answer on the fly and get it wrong here. I'm sorry. Okay. Let me ask a maybe sort of similar question, which is there is this other statute, 1592. And it seems like the United States could recover tariffs under that. And maybe that helps with the idea that there is an obligation. But on the other hand, why do we use the False Claims Act instead of 1592? Like, it seems like 1592 exists and is more specific and seems to speak to this. And there's a way that they can be brought. And why can we jump to the False Claims Act and not use 1592 instead? It's often the case, Your Honor, that the government might have more than one potential mechanism available to pursue fraud that was committed against it. The False Claims Act includes an alternate remedy provision that expressly authorizes that. Sometimes it will be the case that the government could get money back from a defendant through perhaps an ongoing criminal proceeding or a False Claims Act suit. And when that's the case, the government can use either avenue. My understanding is that whether in the customs context we proceed under 1592 or the False Claims Act depends on probably a range of things. But I think one of the things that can probably affect which way we go is how the particular violation comes to the government's attention. And, you know, this is a context where key time relievers can play a useful role, given that millions and millions and millions of items are imported into the United States every year, and customs just can't carefully inspect and analyze each of them. That's why I take it part of your argument is also some statutes provide greater remedies. I think that statutes can provide different remedies. And I think where Congress has left the government with a couple of alternatives, the government can choose which one to pursue subject to whatever limitations exist in each scheme. There just seems to be, I mean, there is a little bit of an intuitive plausibility about their obligation argument, because the government has said it won't collect it retroactively through liquidation. It also hasn't brought 1592. And it didn't jump in when the relator started this False Claims Act case. So the government has kind of had a bunch of opportunities to say we're not collecting this money. So it's just a little odd for a relator to say we still think the money is owed and we are collecting it. Well, the government also thinks that the money is still owed. There is this administrative mechanism, there are these regulations that reflect, I think, sort of a broad policy judgment by commerce that, in the ordinary course, with respect to the mine run of importers who, I presume, you know, abide by their statutory and regulatory duty to exercise reasonable care when they tell the government whether they owe duties on their products, if commerce has decided that it's not going to go back and reopen all previous entries for those factors, that does not preclude liability under either 1592 or the False Claims Act against an importer that acted in bad faith. As for the fact that we haven't intervened in this suit, there are plenty of reasons that the government may or may not intervene in a particular case, and those reasons don't necessarily track with the government's views about the merits of the suit or the importance of the suit. But it can come down to a resource and lots of other things. You know, I'm sorry, I have one other question that I meant to ask your colleague on the same side that Judge Friedland's question posed, and it just had to do with the refund aspect of the regime. Because we wouldn't be talking about a False Claims Act case had they paid the money as a deposit, right? But it just seems odd that if they had paid the money, the regime had said, oh, we have to give it back to you. And so it just seems odd to say, well, how is it that they could have ever owed it if they were entitled to a refund, right? Right. I don't want to get the details exactly wrong about how this scheme works, but I guess the general point that I would make is that statutes treat different actors differently a lot based on their state of mind. You know, lots of statutes include scientia requirements, and two people who do the same thing, one who acts innocently and one who does not, will be treated differently. So I don't think there's really anything unusual or worrisome about the fact that, as reflected in 1592 and the False Claims Act, Congress has made a judgment that people who don't turn square corners in their dealings with the government should be liable even if an innocent actor might not be. Okay. All right. Thank you very much for your argument. Now we will put two minutes on the clock for rebuttal, and then we will be adjourned after that. But please proceed. Look, Judge Wofford, one of the first things on my list to talk about was the refunds. But you've now broached that. But it's very odd indeed that the government is paying back money if there was an obligation. This is not just an administrative scheme, as Eiland suggests and the government suggests. And, you know, it's a choice that we're just not going to go backwards and collect. This is based on the L3 scheme, that we cannot do that notice due process. And I would rely not only on the face of L3, but the regulatory history. I do want to, I don't have much time. I need to make clear that if the federal circuit were to reverse, then no, you cannot uphold this on the alternative basis of product misdescription. Because there would have been no reason, the whole idea of the misdescription theory was that you were avoiding some sort of duty. If there's no duty, that would upset. And that goes to my counts case. I'm sorry, can I pause you there? Okay. Does it matter, so if you lied about what the product was and you knowingly lied about what the product was, do we need to ask why? There has to be some materiality to damages. There has to be some materiality. I mean, just randomly misstating what your product is, I don't think has any impact at all. And we, of course, dispute that heavily. We've followed 7501 guidance. I guess the point would be you didn't know the terms at all. Right. It wouldn't be the lie, that wouldn't be the motivation for the lie. The problem would be that it wasn't a lie. There would be no money owed, so there would be no damages. Right. I just want to make that clear. But it also goes to my counts point and my belief that that same thing is true, even regardless of what the federal circuit does. My friends make a big point that they have two different theories here. But I would say that Safeco should have, that false statement about the duty should have never gone to the jury in the first place. And counts makes clear that if you have two legal theories and one shouldn't have gone to the jury, you get a new trial. I know you need to challenge the general verdict at that point to preserve that. Counts actually says you don't need to request a special verdict form in that case because it shouldn't have gone to the jury in the first place. Counts actually talks about the verdict form. And this builds out of the Maryland versus Baldwin, the Baldwin principle line of cases about general verdicts. I have a final point. Final point would be the idea that in 2018, when my client reads the Sprinkled order, that that somehow reflects what the subjective or objective belief would have been in 2010 is nonsensical in my mind, but also ignores the fact that my client had a CID from the DOJ in hand when reading these things in 2018. And that greatly impacts the way people might read things when there's an objective reading in 2010 that says otherwise. And with that, I would ask for a reversal for entry of judgment as a matter of law for my client, but at a bare minimum for a new trial. Okay. Thank you very much. We appreciate counsel's helpful arguments in this case. The case is started as submitted, and we are adjourned for this session. All rise. This court for this session stands adjourned.
judges: WATFORD, FRIEDLAND, BENNETT